IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Cynthia Diane Buckley, | ) | C/A No.: 1:14-124-TLW-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"). The two issues before the court are whether the
Commissioner's findings of fact are supported by substantial evidence and whether she
applied the proper legal standards. For the reasons that follow, the undersigned
recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

    A.    Procedural History

On April 24, 2007, Plaintiff filed claims for DIB and SSI in which she alleged her
disability began on May 4, 2004. Tr. at 51, 52. Her applications were denied initially and
upon reconsideration. Tr. at 65–68, 69–72, 75–76, 77–78. On July 7, 2009, Plaintiff had a

hearing before Administrative Law Judge ("ALJ") Nicole Forbes-Schmitt. Tr. at 19–48 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 2, 2009, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 519–31. Subsequently, the Appeals Council denied Plaintiff's request for review. Tr. at 532–35. Plaintiff brought an action seeking judicial review of the Commissioner's decision in a complaint filed on September 21, 2010. Tr. at 493. On November 29, 2011, the undersigned issued a Report recommending the Commissioner's decision be reversed and remanded for further administrative action. Tr. at 492–517. United States District Judge Margaret B. Seymour issued an order on December 20, 2011, adopting the Report and remanding the cause under sentence four of 42 U.S.C. § 405(g) for further administrative action. Tr. at 490–91. On May 15, 2013, the Appeals Council issued an order remanding the case to an ALJ and instructing that subsequent claims for DIB and SSI filed on August 25, 2010, be associated with the remanded claim. Tr. at 487. On August 21, 2013, Plaintiff had a hearing before ALJ Carl B. Watson. Tr. at 443–84 (Hr'g Tr.). The ALJ issued an unfavorable decision on September 27, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 416–41. The ALJ's decision provided Plaintiff with the option to either file exceptions with the Appeals Council within 30 days or to file an action in this court within 60 days of the date on which the ALJ's decision became final.[1] Tr. at 417. Plaintiff opted to file an action in this court seeking judicial review of the Commissioner's decision in a complaint filed on January 15, 2014. [ECF No. 1].

---

[1] The ALJ's decision explained that it would become the final decision of the Commissioner on the sixty-first day after the date it was issued.

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 48 years old at the time of the first hearing and 53 years old at the time of the second hearing. Tr. at 25, 456. She completed high school. Tr. at 25. Her past relevant work ("PRW") was as a secretary and a bookkeeper in a restaurant. Tr. at 25–26. She alleges she has been unable to work since February 1, 2007. Tr. at 26.

2.      Medical History

On May 27, 2004, Julie Lesch, LISW-CP, wrote a letter stating Plaintiff was seeing her for weekly therapy sessions and was unable to return to work. Tr. at 226. On May 16, 2005, Ms. Lesch wrote a second letter in which she indicated she treated Plaintiff from April to September 2004 for depression and anxiety. Tr. at 227. She specified Plaintiff's symptoms included suicidal ideations, psychosis, visual hallucination, paranoia, and impaired decision making and judgment. *Id.* She indicated she recently met with Plaintiff again, who appeared more stable, but continued to experience depression and anxiety and be unable to work. *Id.*

Records from Ira Rosenshein, M.D., Ph.D., for the period from June 10, 2004, through November 29, 2007, reflect that Plaintiff was experiencing depression, difficulty concentrating, and paranoia; had problems resulting from her divorce; and was diagnosed with amphetamine dependency and amphetamine-induced psychosis. Tr. at 250–61, 267–68. On April 11, 2005, Dr. Rosenshein provided a letter indicating that he treated Plaintiff for major depression with psychotic features and that she was unable to work at that time. Tr. at 235.

On October 21, 2005, Plaintiff saw internist William R. Cook, M.D., with complaints of sub-sternal chest discomfort, which she indicated she had been experiencing for three or four months. Tr. at 242. Dr. Cook noted that Plaintiff's impending divorce continued to cause her considerable stress. *Id.* Plaintiff complained that her chest discomfort was not brought on or relieved by any measure, but seemed to be present most of the time. *Id.* Dr. Cook noted Plaintiff smoked about a pack of cigarettes per day and had a possible history of coronary disease on her mother's side of the family. *Id.* Dr. Cook observed that Plaintiff looked comfortable and had no difficulty walking. *Id.* On examination, he found Plaintiff had clear lungs and normal heart sounds. *Id.* He noted Plaintiff's chest wall was tender, and that pressing on it reproduced Plaintiff's discomfort. *Id.* Dr. Cook ordered a chest x-ray, which was taken on October 25, 2005, and showed mild cardiomegaly without acute pulmonary disease. *Id.*, Tr. at 243.

Plaintiff returned to Dr. Cook on May 19, 2006, complaining that she had pressure in her chest when under stress. Tr. at 241. Dr. Cook noted that Plaintiff continued to be under stress because of her divorce and recounted that she had seen him in October 2005 because of chest pressure, but had not been able to complete the evaluation. *Id.* He further noted that her basic work-up, including chest x-ray and electrocardiogram, were unremarkable, and he noted no abnormal clinical findings except for chest wall tenderness. *Id.* Dr. Cook prescribed Lexapro, gave her a note that she was unable to work because of medical problems, and instructed her to see him again in two months. *Id.*

Cashton Spivey, Ph.D., conducted a psychological consultative examination of Plaintiff on August 31, 2007. Tr. at 269–71. Plaintiff reported symptoms including sleep disturbance, low energy, attention/concentration problems, crying spells, auditory and visual hallucinations, feelings of paranoia, generalized feelings of anxiety, and ruminations. Tr. at 270. She scored 27 of 30 points on the Mini-Mental State Examination ("MMSE") and showed no cognitive impairments. *Id.* She performed serial sevens, recalled two of three objects after a five-minute delay, demonstrated intact language skills, and followed a three-step command. *Id.* Her abstract reasoning abilities were poor and her insight and judgment were fair-to-poor, based on her report of psychotic symptoms. Tr. at 271. Dr. Spivey diagnosed major depressive episode, generalized anxiety disorder, and psychotic disorder, NOS. *Id.* He assessed a current global assessment of functioning ("GAF")[2] score of 35 with an estimated GAF score of 45 over the prior 12-month period. *Id.* He further stated "Ms. Buckley is an individual who may display difficulty managing funds independently and accurately. Although she was able to successfully perform serial sevens, suggesting intact calculation abilities, she

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.* GAF scores above 70 generally indicate an absence of symptoms and no more than slight impairment. *Id.* GAF scores between 61 and 70 suggest that the individual has mild symptoms, but is generally functioning well in social, occupational, and/or school settings. *Id.* GAF scores between 51 and 60 indicate moderate symptoms or moderate difficulty in social, occupational, and/or school functioning. *Id.* GAF scores below 50 suggest serious symptoms or serious impairment in social, occupational, and/or school functioning. *Id.* 2013.

does report current psychotic symptomatology, which could interfere with mathematical accuracy." *Id.*

State agency consultant Jeffrey Vidic, Ph.D., completed a psychiatric review technique on September 14, 2007. Tr. at 274–87. Dr. Vidic considered Listings 12.03, 12.04, and 12.06, but determined that Plaintiff did not meet the criteria under these Listings. *Id.* He assessed moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 284. Dr. Vidic also completed a mental residual functional capacity assessment in which he indicated Plaintiff was moderately limited with respect to the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to work in coordination with or proximity to others without being distracted by them; and the ability to interact appropriately with the general public. Tr. at 302–04. Dr. Vidic provided the following assessment:

> [t]he claimant is capable of understanding[,] remembering and carrying out simple jobs instructions without any extra supervision. She would work better i[n] situations away from the general public. She can get along with co workers. She can adapt to changes in the work setting and maintain proper hygiene. She is able to travel to the work site, set simple goals. She can adapt to changes in the workplace and avoid hazards.

Tr. at 304.

On January 15, 2008, state agency consultant Mary K. Thompson, Ph.D., completed a psychiatric review technique in which she considered Listings 12.03, 12.04, and 12.06, but concluded Plaintiff's impairments did not meet a Listing. Tr. at 311–24. She assessed moderate restriction of activities of daily living; moderate difficulties in

maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 321. Dr. Thompson also completed a mental residual functional capacity assessment in which she determined Plaintiff was moderately limited with respect to the following: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to work in coordination with or proximity to others without being distracted by them; and the ability to interact appropriately with the general public. Tr. at 339–41.

On February 12, 2008, Plaintiff presented to Berkeley Community Mental Health Center for an initial assessment. Tr. at 380–88. She reported a history of major depressive disorder, bipolar affective disorder, and schizophrenia. Tr. at 381. She endorsed symptoms including severe paranoia, delusions, anxiety, panic attacks, crying spells, and racing thoughts. *Id.* She also complained of suicidal thoughts and low medication tolerance. Tr. at 382. Plaintiff's appearance and hygiene were neat and clean. Tr. at 386. Her motor activity was appropriate to the situation. *Id.* Her attitude was cooperative during the interview. *Id.* Her affect was tearful and her mood was depressed. *Id.* She spoke at a normal rate and in a normal tone. *Id.* Her thought process and content were normal. Tr. at 387. She complained of visual and auditory hallucinations, but was fully oriented. *Id.* Her insight and judgment were good. *Id.* However, she had poor remote, recent, and immediate memory. *Id.* The clinician diagnosed major depressive disorder and schizophrenia and assessed a GAF score of 55. Tr. at 388.

Plaintiff presented to Berkeley Community Mental Health Center for her first treatment visit in February 2008. Tr. at 377. She indicated that she needed a new

psychiatrist because Dr. Rosenshein left his practice. *Id.* She complained of auditory hallucinations, decreased sleep, paranoia, and daily panic attacks. *Id.*

On April 8, 2008, Plaintiff presented to Adrienne Copey, D.O., at Berkeley Community Mental Health Center. Tr. at 376. She reported being "under a lot of stress." *Id.* She complained of sleep disturbance, depressed mood, auditory hallucinations, and mind racing. *Id.*

On April 24, 2008, Plaintiff complained to Dr. Cook of sub-sternal pressure and abdominal discomfort. Tr. at 395. On examination, Dr. Cook found she looked comfortable at rest, did not have difficulty walking, and had clear lungs, normal heart sounds, and an unremarkable abdomen. *Id.* He prescribed nitroglycerine and ordered diagnostic studies, including a stress test, chest x-ray, and gallbladder ultrasound. *Id.*

On April 28, 2008, Plaintiff went to the emergency room at the Medical University of South Carolina ("MUSC") with complaints of left-sided chest pain. Tr. at 362. Plaintiff was discharged on April 29, 2008, with diagnoses of chest pain and depression/anxiety. Tr. at 365–69. Plaintiff's discharge instructions indicated that "an important part" of her problem was from anxiety and emotional distress and informed her that "[e]motional upsets can cause many different physical symptoms." Tr. at 365. Plaintiff was informed that examination and testing did not identify a specific cause for her chest pain, but noted chest pain such as that she reported was not usually caused by serious heart or lung issues. Tr. at 366. Plaintiff was instructed to continue taking her Prozac and to return to the ER if she experienced worsening of condition or concerns,

severe pain, or severe shortness of breath. *Id.* She was instructed to follow up with her psychiatrist and Franklin C. Fetter Family Health Center ("FCFFHC"). *Id.*

Plaintiff presented to Lori Gerding, M.D., at Berkeley Community Mental Health Center on July 1, 2008. Tr. at 373. She reported anxiety, paranoia, poor sleep, and vague auditory hallucinations. *Id.* She complained that Ativan made her sleepy and that Prozac caused nausea. *Id.*

On August 5, 2008, Dorchester County EMS treated Plaintiff after she was found standing in a roadway outside her home. Tr. at 413. She was described as "agitated and scared." *Id.* Plaintiff's sister and boyfriend took custody of her instead of having her transported to the hospital. *Id.*

On October 16, 2008, Plaintiff reported depression and psychotic thoughts and Dr. Gerding noted Cluster B traits.[3]

Plaintiff followed up at Berkeley Community Mental Health Center on November 13, 2008. Tr. at 406. She reported depressed mood, crying spells, anxiety, and increased stress. *Id.* She complained that Ativan was making her feel tired all the time. *Id.* A note below the treatment notes from this visit indicates "Pt very concerned 'that you take good notes for my Social Security.' – court date P for SSI." *Id.*

---

[3] Personality disorders are classified into three clusters based on their similarities. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013. Antisocial, borderline, histrionic, and narcissistic personality disorders are included in Cluster B. *Id.* Individuals diagnosed with these disorders frequently behave in dramatic, emotional, or erratic manners. *Id.*

On November 14, 2008, Plaintiff returned to Dr. Cook's office without an appointment and demanded that her blood pressure and blood sugar be tested. Tr. at 397. When she complained that she also wanted to be seen by a doctor, she saw George E. Minson, M.D., who noted she had multiple complaints, including weakness, dizziness, chest pain, bilateral upper arm pain, hot flashes, weight gain, vertigo, and a bad gallbladder. *Id.* Dr. Minson's notes indicate that Plaintiff "implie[d]" that she wished to be admitted to the hospital and that she denied having had a cardiac evaluation at MUSC. *Id.* Dr. Minson noted no abnormal clinical findings other than mild, diffuse tenderness; diagnosed multiple somatic complaints of unknown etiology and a psychiatric disorder; determined Plaintiff did not need to be hospitalized; and instructed Plaintiff to return the following week to see Dr. Cook. *Id.*

On December 23, 2008, Plaintiff saw Dr. Cook to review her test results. Tr. at 399. Dr. Cook noted that Plaintiff's blood work and gallbladder studies were normal, and that she had infiltration of the liver. *Id.* Plaintiff complained of stress, anxiety, and frequent panic attacks. *Id.* Dr. Cook noted Plaintiff looked comfortable and had no difficulty walking, indicated she planned to work on reducing her weight, and noted she saw a psychiatrist at mental health. *Id.* Tr. at 399.

In January 2009, Dr. Cook prescribed an Advair inhaler for Plaintiff's complaints of shortness of breath and wheezing. Tr. at 401. On examination, Dr. Cook found no abnormalities and instructed Plaintiff to return as needed. *Id.*

On January 23, 2009, Plaintiff complained to Dr. Gerding that her television was talking to her and that others were watching her. Tr. at 405. Plaintiff reported decreased

panic and auditory hallucinations and indicated that her sleep varied. *Id.* Plaintiff reported what she classified as "Tourette's." *Id.*

Plaintiff presented to John Ellyn, M.D., for an eye examination on February 11, 2009. Tr. at 762–67. Dr. Ellyn diagnosed early glaucoma and right amblyopia. Tr. at 767.

On September 29, 2009, Plaintiff reported to Dr. Gerding that she was recently denied disability benefits. Tr. at 801. Plaintiff indicated that she wanted to go to sleep and not wake up. *Id.* She stated that her appetite had increased, causing her to gain weight. *Id.* She reported poor sleep, auditory hallucinations, and stress. *Id.* However, Dr. Gerding assessed a GAF score of 60. *Id.*

Plaintiff followed up for test results at FCFFHC on October 7, 2009. Tr. at 791. Her glucose was increased and she reported occasional headaches. *Id.* However, Plaintiff followed up on November 10, 2009, and reported her headaches had resolved. Tr. at 790.

Plaintiff was treated by Dr. Gerding on January 11, 2010, February 19, 2010, and March 11, 2010. Tr. at 798–800. She reported stress and relationship problems involving a couple of boyfriends. *Id.* Dr. Gerding assessed GAF scores of 60 to 65. *Id.*

Plaintiff presented to MUSC on March 25, 2010, complaining of chest pain and shortness of breath. Tr. at 778. A CT scan revealed no evidence of coronary artery stenosis or occlusion. Tr. at 779.

On May 13, 2010, Plaintiff reported to Dr. Gerding that she was taking care of her boyfriend's 80-year-old mother. Tr. at 797. She complained of feeling overwhelmed and experiencing increased appetite and paranoia. *Id.* Dr. Gerding assessed a GAF score of 62. *Id.*

Plaintiff followed up with Dr. Gerding on July 1, 2010. Tr. at 796. She reported feeling overwhelmed and experiencing psychotic thoughts. *Id.* However, Dr. Gerding indicated she did not appear psychotic. *Id.* Dr. Gerding indicated that Plaintiff repeatedly asked if she was schizophrenic and stated that having a name for her condition "might help her get her disability." *Id.* Dr. Gerding noted that, in spite of complaints of memory loss, Plaintiff was able to manage her own finances, take care of herself and her boyfriend's 80-year-old mother, and rent out her own trailer. *Id.* Dr. Gerding assessed a GAF score of 60. *Id.*

On August 23, 2010, Plaintiff followed up with Dr. Gerding. Tr. at 794. She complained of confusion, increased appetite, nightmares, and multiple physical problems. *Id.* She indicated that others were watching her through her television. *Id.* Dr. Gerding diagnosed malingering and assessed a GAF score of 60. *Id.*

On September 25, 2010, Plaintiff followed up at FCFFHC. Tr. at 786. She complained of a hernia and frequent diarrhea, but denied abdominal pain. *Id.* The doctor referred her to a general surgeon. *Id.*

Plaintiff followed up with Dr. Gerding on November 2, 2010. Tr. at 792. She endorsed symptoms including auditory hallucinations, paranoia, memory loss, and depression. *Id.* She indicated that she did not like to leave her house and that she received special messages from her television and radio. *Id.* Dr. Gerding indicated the following "although pt endorses sxs of multiple Axis I dx—affective, psychotic, anxiety—again, ? the validity of complaints– pt Ø depressed, anxious or psychotic." *Id.*

12

State agency consultant Kathleen Broughan, Ph.D., completed a psychiatric review technique on December 10, 2010. Tr. at 804–16. Dr. Broughan considered Listings 12.04, 12.06, and 12.08. Tr. at 804. She determined that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 814. Dr. Broughan further indicated the following:

> Great weight was given to the opinion of Lori Gerding, MD of Berkeley MHC, who has been treating clmnt. Allegations of severe anxiety attacks, short term memory loss, trouble focusing, chronic fatigue, severe psychosis and depression are only partially credible. Although clmnt has been receiving tx for a wide range of psychological complaints, her treating physician questions the validity of these complaints and symptoms and has included a diagnosis of malingering. Overall, file evidence indicates that claimant's symptoms and impairments impose only minimal limitations on her ability to perform basic work-related tasks and functions.

Tr. at 816.

On April 5, 2011, an x-ray of Plaintiff's left knee revealed mild-to-moderate degenerative joint disease. Tr. at 819.

Plaintiff presented to Daniel Bates, M.D., for a consultative examination on April 27, 2011. Tr. at 820–23. She complained of a burning feeling in her left leg and shortness of breath when walking or climbing stairs. Tr. at 820. She indicated she could walk for 10 minutes, stand for 30 minutes, and sit for an indefinite period. *Id.* Dr. Bates palpated a moderate ventral hernia. Tr. at 822. Plaintiff demonstrated normal gait and range of motion in all extremities. *Id.* Dr. Bates observed impaired vision in one eye, but Plaintiff's overall vision was within normal limits. *Id.* He noted that Plaintiff had appropriate judgment and good insight. *Id.*

13

On June 2, 2011, Jean Smolka, M.D., completed a physical residual functional capacity assessment in which she indicated Plaintiff had the following restrictions: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and occasionally climb ladders/ropes/scaffolds, kneel, and crawl. Tr. at 824–31.

Plaintiff attended a consultative examination with Marcus Schaefer, M.D., M.P.H., on November 1, 2011. Tr. at 832. She informed Dr. Schaefer that she most often experienced anxiety when in crowds and took Ativan for anxiety approximately once a week. *Id.* She stated she experienced memory problems and had difficulty completing activities of daily living because she was tired. *Id.* She stated she had headaches approximately twice a week. Tr. at 833. Dr. Schaefer did not observe a hernia, but he did note facial weakness around Plaintiff's lip and maxillary area. *Id.* He observed decreased muscle tone in Plaintiff's orbicularis oris on the right and in the muscles above the maxilla, which he indicated was strongly suggestive of a cerebrovascular accident. Tr. at 834. Plaintiff's vision was 20/70 on the right and 20/25 on the left. *Id.* The patella of Plaintiff's left knee was slightly tender to palpation, but her left knee showed no abnormality or significant limitation in motion. *Id.* Dr. Schaefer indicated that the arthritis in Plaintiff's left knee would not likely interfere with light or sedentary work. Tr. at 835. He also stated that Plaintiff's mental health issues appeared to be adequately treated and that Plaintiff did not appear to be restricted from performing light or sedentary work by her mental health issues. *Id.*

14

On November 2, 2011, Plaintiff attended a consultative examination with E.G. Schleimer, Ph.D. Tr. at 836–37. Dr. Schleimer observed that Plaintiff's attention and concentration were fair. Tr. at 836. He saw no evidence of major psychopathology or organic brain disorder. *Id.* Dr. Schleimer assessed a GAF score of 40, but indicated Plaintiff could handle funds on her own behalf. Tr. at 837.

State agency consultant Kimberly Brown, Ph.D., completed a psychiatric review technique on November 9, 2011. Tr. at 838–51. She considered Listings 12.04, 12.06, and 12.0, but determined Plaintiff's impairments did not meet a Listing. *Id.* She determined Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 848. Dr. Brown also completed a mental residual functional capacity assessment in which she indicated Plaintiff was moderately limited with respect to the following: the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially-appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to be aware of normal hazards and take appropriate precautions; and the ability to set realistic goals or make plans independently of others. Tr. at 852–54.

State agency consultant William Cain, M.D., completed a physical residual functional capacity assessment on November 17, 2011, in which he indicated Plaintiff was limited as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds, stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and occasionally climb ladders/ropes/scaffolds, kneel, and crawl. Tr. at 856–63.

On January 18, 2012, Plaintiff brought a psychology textbook to her appointment with Dr. Gerding and discussed symptoms she alleged that were consistent with a diagnosis of schizophrenia. Tr. at 886. Plaintiff told Dr. Gerding that she had poor hygiene, but Dr. Gerding observed that Plaintiff was well-dressed, wearing makeup, and had her hair and nails done. *Id.* Dr. Gerding assessed a GAF score of 62. Tr. at 887. She noted "again, don't feel pt schizophrenic." Tr. at 888.

Plaintiff complained of severe depression and psychosis to Dr. Gerding on March 13, 2012. Tr. at 883. Dr. Gerding assessed a GAF score of 58 and increased Plaintiff's dosage of Prozac. Tr. at 884–85. She wrote "[d]o not feel pt schizophrenic." Tr. at 885.

On April 17, 2012, Plaintiff reported to Dr. Gerding that things were going fairly well, but that she had recently experienced interrupted sleep and an anxiety attack. Tr. at 880. Dr. Gerding assessed a GAF score of 62. Tr. at 881.

Plaintiff reported depressed mood, crying spells, auditory and visual hallucinations, and increased appetite on June 4, 2012. Tr. at 877. Dr. Gerding assessed a GAF score of 62. Tr. at 878.

On August 6, 2012, Plaintiff reported to Dr. Gerding that she had recently ended a relationship with her boyfriend, who had been physically violent. Tr. at 874. She reported increased stressors and symptoms including paranoia, visual and auditory hallucinations, and thoughts of self-harm. *Id.* Dr. Gerding assessed a GAF score of 58. Tr. at 875.

On September 6, 2012, Plaintiff reported multiple symptoms, including hearing voices, losing periods of time, having thoughts of self-harm, experiencing poor sleep, and neglecting self-care. Tr. at 871. Dr. Gerding assessed a GAF score of 60 and increased Plaintiff's Ativan dosage. Tr. at 872–73.

Plaintiff visited Dr. Gerding for a medication check on December 17, 2012. Tr. at 865–67. She complained of having poor sleep, hearing voices, and feeling fatigued. Tr. at 865. She also reported an incident of domestic violence involving an ex-boyfriend. *Id.* Dr. Gerding assessed a GAF score of 60. Tr. at 866. She added post-traumatic stress disorder to Plaintiff's diagnoses, and indicated that she did not feel Plaintiff was psychotic, but instead thought her symptoms were anxiety-related. Tr. at 867.

On January 25, 2013, Plaintiff reported to Dr. Gerding that she was not doing well since her ex-boyfriend obtained a restraining order. Tr. at 890. Dr. Gerding assessed a GAF score of 60. Tr. at 891.

On February 28, 2013, Plaintiff reported experiencing nausea as a side effect of medication. Tr. at 892. She also complained of being very depressed, having poor sleep, and being tired throughout the day. *Id.* She reported that she discontinued her prescription for Prazosin because it increased her nightmares. *Id.* Dr. Gerding decreased Plaintiff's dosage for Geodon and increased her Prozac dosage. Tr. at 894.

Plaintiff reported doing better on March 27, 2013. Tr. at 895. However, she still endorsed symptoms of psychosis including hearing voices and stated that her psychosis increased with her stress level. *Id.* Dr. Gerding assessed a GAF score of 58. Tr. at 896.

On May 2, 2013, Plaintiff reported that she was not feeling as stressed and that she had a new boyfriend. Tr. at 898. Dr. Gerding assessed a GAF score of 62. Tr. at 899.

Plaintiff presented to Summerville Health Center on June 3, 2013. Tr. at 902–05. She noted periods of elevated blood sugar and requested that her hormone levels be checked. Tr. at 902. Facial asymmetry was noted, but Plaintiff indicated her psychiatrist believed it to be a side effect of medication because her symptoms were transient. *Id.* Aside from facial muscle atrophy, Plaintiff had no abnormal findings on examination. Tr. at 904. She had normal musculoskeletal range of motion, muscle strength, and stability in all extremities with no pain. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

i.    July 7, 2009

At the hearing on July 7, 2009, Plaintiff testified she had not worked since leaving her job as a secretary and bookkeeper in May 2004. Tr. at 24. She indicated that she alleged February 1, 2007, as her onset date of disability because it was the date on which Dr. Rosenshein, her former treating psychiatrist, told her that she was no longer able to work. Tr. at 26, *see* Tr. at 15 (ALJ describing Dr. Rosenshein as a treating psychiatrist). Plaintiff stated she was unable to work because of difficulty concentrating and staying

focused, as well as fear of leaving her house. Tr. at 26–27. Plaintiff endorsed difficulties with focusing to read books and to watch television programs. *Id.* She testified that she no longer experienced side effects from medication because her doctors determined she should receive lower dosages as she had the metabolism "of a seven year old." Tr. at 27–28. Plaintiff stated that Geodon helped her psychotic symptoms to some extent, but that she did not believe Prozac helped with her depression. Tr. at 28.

When asked about her activities of daily living, Plaintiff said that she did light housework and that she cooked basic meals, but was unable to prepare more than one dish at a time. Tr. at 28–29. She later quantified the days she felt like doing light housework as about one day per week. Tr. at 35. She stated that on a "good day," which she estimated experiencing about two days per week, she could go to the grocery store, go pick up medication, or go to Goodwill to get clothes. Tr. at 29, 36. She indicated she only went to those places, and she tried to go when the stores would not be crowded. Tr. at 29. She explained that she would panic if there were more than five people in a room or if anyone was near her in the grocery-store line. *Id.*

Plaintiff testified that she had not been hospitalized for her mental condition, but that emergency personnel wanted to have her hospitalized in August 2008 until her best friend/informal guardian convinced them not to do so. Tr. at 29–31. She described that August 2008 incident as one in which she left her home without shoes and in her pajamas because she thought there was someone in her closet. Tr. at 31. She said the police picked her up and released her to her friend/guardian, who took her to see someone in her psychiatrist's office that day. *Id.*

19

Plaintiff said she told her doctors about how her mind raced and that she sometimes could not control what she said, but that she was not sure whether she had been diagnosed with Tourette's syndrome. Tr. at 32–33. She testified that she had four or five panic attacks per week, lasting from 20 minutes to seven or eight hours. Tr. at 34. She said she could tell a panic attack was about to happen because she would feel chest pressure and have shortness of breath. *Id.* She explained she had gone to the ER a couple of times because she thought she was having heart attacks, although she was diagnosed with panic/anxiety attacks. *Id.* She testified that when she had a panic attack, she took Ativan, which required her to lie down for about six hours. Tr. at 35. She said that she had suicidal thoughts two or three times per week, and that she discussed those thoughts during therapy. Tr. at 36. She said that she had been seeing Dr. Cook, her family doctor, for about ten years. Tr. at 37. She said she had not asked Dr. Cook whether she could work because he treated her for her physical problems, and he knew she could not work because of the physical and mental problems she had. *Id.* She described her physical problems as congenital arthritis in her left leg and frequent headaches. Tr. at 37–38. Plaintiff said she had difficulty bathing and dressing because she had a problem with looking into a mirror and she sometimes could not remember whether she had bathed. Tr. at 38–39. She testified that her mind racing caused her to have difficulty sleeping more than two and one half hours at one time. *Id.* She testified that she heard buzzing sounds in her head, which sounded like many people speaking at once. Tr. at 39. She said her friend/guardian managed her finances for her. Tr. at 41–42. She testified that she heard voices on a daily basis. Tr. at 43.

ii.    August 21, 2013

At the hearing on August 21, 2013, Plaintiff testified that she had not attempted to return to work since 2004. Tr. at 451. She stated that her psychosis caused her to hear voices and prevented her from being around people she did not know well. Tr. at 451–52. She indicated that she had daily anxiety attacks that lasted from 15 minutes to three hours and were brought on by activities such as driving and grocery shopping. Tr. at 455, 457–58. She stated her anxiety attacks were frequently accompanied by headaches. Tr. at 471. She explained she treated her anxiety attacks with Ativan, which caused her to be sedated for at least three hours. Tr. at 458. Plaintiff indicated that she avoided leaving her home for nine to 14 days at a time and that she typically left her home two to three times per month. *Id.*, Tr. at 459. She stated she had memory loss and experienced visual hallucinations. Tr. at 456. She complained of crying spells and sleep disturbance. Tr. at 458. She stated that she felt that people were watching her through her television and her mirrors. Tr. at 459. She confirmed that she had not been diagnosed with Tourette's syndrome, but stated "I scream things out all the time." Tr. at 460.

Plaintiff testified that she experienced pain in her left knee that was aggravated by walking and climbing stairs. Tr. at 452. She stated she was five feet, three inches tall and weighed 180 pounds and that she had gained weight because her knee pain prevented her from walking. *Id.* She also indicated she had been diagnosed with a hernia that swelled and protruded when she moved around a lot. Tr. at 453, 466. She testified she had borderline diabetes and for which she was instructed to control her diet and to exercise. *Id.* She indicated she was recently diagnosed with Bell's palsy. Tr. at 462. Plaintiff stated

that she had early glaucoma and that she had recently experienced a seizure. Tr. at 466–
67. Plaintiff testified that she experienced pain in all her joints, but had not been
diagnosed with fibromyalgia. Tr. at 469. Plaintiff stated that she had been diagnosed with
shingles twice in the past, but they were no longer a problem. Tr. at 465.

Plaintiff testified that she did not have health insurance and could not afford to go
to the doctor as frequently as she needed to do so. Tr. at 461.

Plaintiff testified that her days ran together because of her sleep schedule. Tr. at
462. She stated that she was no longer allowed to cook because she previously caused
three fires on the stove and burned her hair. Tr. at 462–63. She indicated she had
problems performing household chores because the noises emitted by household
appliances caused her head to hurt. Tr. at 473.

b.     Vocational Expert Testimony

i.     July 7, 2009

Vocational Expert ("VE") Arthur F. Schmitt, Ph.D. testified that Plaintiff's PRW
included work as a bookkeeper, *Dictionary of Occupational Titles* ("*DOT*") number
210.382-014 and a secretary, *DOT* number 201.362-030, which were both sedentary with
specific vocational preparations ("SVPs") of six, which is considered to be skilled. Tr. at
44. The ALJ asked Dr. Schmitt to consider a person of Plaintiff's age, education, and
PRW who had no exertional limitations and was limited to performing simple, repetitive
tasks that involved no contact with the general public. *Id.* Dr. Schmitt testified that such a
person could not perform Plaintiff's PRW, but could perform unskilled jobs at the
medium exertional level as a companion, *DOT* number 309.677-018, with 5,360 jobs in

South Carolina and 115,790 jobs nationally; a janitor, *DOT* number 382.664.010, with 30,000 jobs in South Carolina and 2,064,000 jobs nationally; and a laundry operator, *DOT* number 361.684-010, with 3,270 jobs in South Carolina and 43,500 jobs nationally. Tr. at 44–45. The ALJ added additional nonexertional restrictions to include working with five or fewer co-workers, being expected to produce at a low production quota rate, and being able to maintain concentration and attention throughout the day, but occasionally being off-task. Tr. at 45. The VE opined that such a person could not perform the job as a janitor, but could work as a companion and laundry operator. *Id.* In response to additional hypothetical restrictions, the VE opined that there would be no competitive employment available for a person with the above limitations, but who lacked the concentration, persistence, and pace for even simple, repetitive tasks, required close supervision, and was frequently off-task. Tr. at 46.

Plaintiff's attorney asked if an individual with poor insight and judgment could perform the jobs identified. *Id.* The VE testified that factor would eliminate jobs. *Id.* Plaintiff's attorney asked if the need to take an unscheduled daily break would eliminate jobs. Tr. at 47. The VE testified that it would eliminate all jobs. *Id.*

### ii.    August 21, 2013

VE John Wilson testified that Plaintiff performed PRW as a secretary, a bookkeeper, and a cafeteria waitress. Tr. at 478. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's vocational profile who could perform medium work, except that she could occasionally climb ladders, ropes, and scaffolds; could occasionally kneel and crawl; and was limited to simple, routine, repetitive tasks in an environment

where changes were infrequent and introduced gradually with no high production demands and no interaction with the general public. *Id.* The ALJ further stated the individual could work in proximity to co-workers, but would work best on individual tasks alone. *Id.* Mr. Wilson identified medium and unskilled jobs as a laundry worker, *DOT* number 361.684-014, with 2,999 jobs in South Carolina and 201,180 jobs nationally; a janitor, *DOT* number 381.687-018, with 26,490 jobs in South Carolina and 2,068,460 jobs in the national economy; and a hand packer, *DOT* number 920.587-018, with 15,580 jobs in South Carolina and 877,890 jobs in the national economy. Tr. at 478–79. The ALJ then asked the VE to assume the same restrictions in the first hypothetical, but to reduce the exertional demand to the light exertional level. Tr. at 479. The ALJ identified light, unskilled jobs as a housekeeper, *DOT* number 323.687-014, with 15,580 jobs in South Carolina and 877,890 jobs in the national economy; a garment bagger, *DOT* number 920.687-018, with 9,850 jobs in South Carolina and 666,860 jobs in the national economy; and a laundry worker, *DOT* number 302.685-010, with 15,580 jobs in South Carolina and 877,980 jobs in the national economy. *Id.* The ALJ then asked the VE to assume that the individual would have confusion to the extent that she would be off task for the performance of even unskilled work for one-third of an eight-hour workday and would be absent from work four days per month. Tr. at 479–80. The VE testified the additional restrictions would eliminate all jobs. Tr. at 480.

Plaintiff's attorney then questioned the VE. Tr. at 480–82. Plaintiff's attorney asked if the restriction on interaction with the general public reduced the numbers for any of the jobs identified. Tr. at 480. The VE testified that there were jobs as a janitor that

could be performed after-hours and that most janitorial jobs involved no contact with the public. Tr. at 480–81. Plaintiff's attorney then asked the VE to assume the same restrictions in the ALJ's hypothetical, but to assume that the individual would act strangely and be unable to perform her work for five to 30 minutes at a time, on a recurring basis. Tr. at 481. The VE testified that such a restriction would eliminate all jobs. *Id.*

### 2.    The ALJ's Findings

In his decision dated September 27, 2013, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.
2.    The claimant has not engaged in substantial gainful activity since February 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: an affective disorder, anxiety, post-traumatic stress disorder (PTSD), somatization disorder, Cluster B traits, a malingering disorder, obesity, arthritis of the left knee, and a history of ventral hernia (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work except that she can occasionally climb ladders, ropes, and scaffolds; she can occasionally kneel and crawl; she is limited to simple, routine, repetitive tasks in an environment where changes are infrequent and are introduced gradually, there are not high production demands, and there is no interaction with the general public; and she can work in proximity to co-workers, but would do best working on tasks alone.
6.    As a result of her residual functional capacity as described above, the claimant is unable to perform her past relevant work (20 CFR 404.1565 and 416.965).

25

7.    The claimant was born on August 11, 1960 and was 46 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 421–32.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    she failed to comply with Judge Seymour's order directing that she specifically consider the effects of Plaintiff's panic attacks and Plaintiff's use of Ativan to treat them;

2)    she failed to consider the combined effects of Plaintiff's severe and non-severe impairments;

3)    she made improper inferences concerning Plaintiff's symptoms and functional limitations based on Plaintiff's lack of medical treatment; and

4)    she failed to comply with SSR 00-4p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen*

27

impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v.*

---

*v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

*Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Consideration of Limitations Imposed by Panic Attacks and Medication Used to Treat Panic Attacks

Plaintiff argues that the Commissioner failed to comply with Judge Seymour's order directing the ALJ to "discuss Plaintiff's claimed panic attacks, the side effects of taking Ativan for those attacks, and the physical symptoms such attacks allegedly create." [ECF No. 13 at 6].

The Commissioner argues that the ALJ specifically wrote that he considered the district court's remand order and that he complied with its requirements. [ECF No. 14 at 15].

The Report, as adopted in Judge Seymour's order, directed the ALJ to "particularly discuss Plaintiff's claimed panic attacks, the side-effects of taking Ativan for those attacks, and the physical symptoms such attacks allegedly create." Tr. at 512.

The ALJ acknowledged that Plaintiff took Ativan and reported sleepiness as a side effect. Tr. at 425. However, he indicated that findings upon examination were not consistent with Plaintiff's allegations. Tr. at 426. He noted that findings during psychiatric examinations were normal; that Plaintiff was able to interact appropriately with her psychiatrist and the office staff; that Plaintiff did not frequently miss treatment visits because of her symptoms; that Plaintiff did not exhibit excessive hypersomnolence

30

or sedation; and that Plaintiff did not complain of significant medication side effects or difficulty leaving her home to attend her scheduled appointments. *Id.* He acknowledged that Plaintiff had sought out emergency room treatment for anxiety-related chest pain on at least two occasions, but that she improved significantly with limited acute care. *Id.* The ALJ discussed Plaintiff's ability to live independently and with others, her ability to engage in activities of daily living, her ability to manage financial affairs, and the fact that she cared for her boyfriend's ailing mother. *Id.*

The undersigned recommends a finding that the Commissioner complied with the component of Judge Seymour's order directing the ALJ to consider the effects of Plaintiff's alleged panic attacks and the medication used to treat them. Although the ALJ did not directly state that Plaintiff did not experience frequent panic attacks, he pointed to specific evidence to support his finding that her panic attacks were not as disabling as she alleged. *See* Tr. at 426. He also cited evidence to support his finding that Plaintiff's medication did not cause extreme drowsiness or incapacitate her. *See id.* This was reasonable considering that Plaintiff did not present to the emergency room for treatment of panic attacks after 2010 and was diagnosed by her psychiatrist with malingering in August 2010. *See* Tr. at 365–67, 770, 794. In light of evidence that suggested Plaintiff was exaggerating her illness, statements from Plaintiff's long-term treating psychiatrist, and GAF scores suggesting only mild to moderate impairment, the ALJ reasonably concluded that panic attacks and medication used to treat panic attacks were not as disabling as Plaintiff alleged and in limiting Plaintiff as reflected in the assessed RFC. *See* Tr. at 13–17.

2.      Combination of Severe and Non-Severe Impairments

Plaintiff argues that the ALJ failed to consider the individual effects of any of the impairments he designated as non-severe or their effects in combination with her severe impairments. [ECF No. 13 at 8]. Plaintiff maintains that the ALJ erred in neglecting to consider how Plaintiff's severe and non-severe impairments exacerbated one another. *Id.* at 8–9.

The Commissioner further maintains that the ALJ's RFC encompasses all of Plaintiff's "credibly established functional limitations stemming from her combined impairments." [ECF No. 14 at 16].

To establish the existence of an impairment, there must be medical evidence consisting of signs, symptoms, and laboratory findings that indicate some anatomical, physiological, or psychological abnormality. 20 CFR §§ 404.1508, 416.908. A claimant's statement of symptoms alone cannot be used to determine the existence of an impairment. *Id.* A severe impairment "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

When a claimant has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is

required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

However, the Fourth Circuit later indicated that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716791 (D.S.C. Aug. 28, 2012) citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995).

Judge Seymour's order directed the Commissioner to examine and explain the combined effect of all of Plaintiff's medically-determinable impairments, severe and non-severe, on her ability to work. Tr. at 517.

After identifying Plaintiff's severe impairments, the ALJ indicated the following:

> While the claimant has reported a history of shingles, hyperlipidemia, borderline diabetes mellitus, painful leg veins, a  history of Bell's palsy, sleep apnea, fibromyalgia, Tourette's syndrome, irritable bowel syndrome, a back condition, an enlarged heart, deep venous thrombosis, glaucoma, migraine headaches, gallbladder problems, a seizure condition, a pituitary gland condition, a throat condition, chest pain, and schizophrenia, these impairments are not found to be "severe," as they either are not supported by objective signs, symptoms, or laboratory findings and/or no more than minimally affect her ability to perform work related activity. 20 CFR § 404.1508 and § 416.908 and Exhibit 6E, Exhibit 10E, and Exhibit 12E.

Tr. at 422. He further noted that claimant had not been diagnosed with or demonstrated symptoms or limitations on examination that were consistent with Tourette's syndrome, irritable bowel syndrome, a throat condition, sleep apnea, schizophrenia, a vein condition, a seizure disorder, a pituitary gland condition, migraine headaches, deep venous thrombosis, a back condition, or a gallbladder condition. *Id.* He wrote that, while Plaintiff had been diagnosed with a history of shingles, hyperlipidemia, borderline diabetes, Bell's palsy, an enlarged heart, glaucoma, and chest pain, she had required little medical attention and had no significant findings on examination. *Id.*

The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. at 422. He determined Plaintiff was limited to medium work based on the combined effects of obesity, arthritis of the left knee, and a ventral hernia. Tr. at 428. He further found that, because of left knee arthritis, she was restricted to no more than occasional climbing of ladders, ropes, and scaffolds. *Id.* The ALJ specifically noted that Plaintiff's obesity was not complicated by sleep apnea, heart disease, or uncontrollable blood pressure and had not affected her ability to move beyond the limitations identified in the RFC. Tr. at 429. The ALJ considered Plaintiff's diagnoses of affective disorder, anxiety, PTSD, a somatization disorder, Cluster B traits, and a malingering disorder and "limited the claimant to the performance of simple, routine, and repetitive tasks performed in an environment where changes are infrequent and introduced gradually; there are no high production demands; no interaction with the general public is required; and while the

claimant can work in proximity to co-workers, she would do best working on tasks alone." Tr. at 429–30.

The undersigned recommends a finding that the ALJ adequately assessed Plaintiff's severe and non-severe impairments. The ALJ provided a rational explanation for his conclusions as to which impairments were severe and which were not, explaining that some of Plaintiff's alleged impairments were not supported by documentary evidence and that others imposed no more than minimal limitations. *See* Tr. at 422. The ALJ's determination regarding Plaintiff's severe and non-severe impairments was particularly reasonable in light of Plaintiff's diagnoses of somatization disorder and malingering disorder, which explain a basis for alleged symptoms that were not substantiated by objective proof. *See* Tr. at 794, 886.

Although Plaintiff generally argues that the ALJ failed to consider her non-severe impairments in determining her RFC, she particularly focuses on the ALJ's failure to discuss how her chest pain and enlarged heart interacted with her affective disorder and anxiety to increase the severity of her panic attacks. [ECF No. 13 at 8]. However, the ALJ specifically discussed Plaintiff's enlarged heart in the context of her anxiety, but stated that Plaintiff's chest pain was determined to be non-cardiac in nature and resolved with "limited acute care for her anxiety." See Tr. at 422. The ALJ's statement is confirmed by the record, which indicates that Plaintiff's chest pain was an anxiety reaction as opposed to a medically-documented impairment. See Tr. at 365. Because chest pain was a symptom of anxiety as opposed to a medically-documented condition, 20 CFR §§ 404.1508 and 416.908, preclude the ALJ from considering it as an impairment.

Additionally, the medical evidence does not suggest any correlation between Plaintiff's enlarged heart and the severity of her panic attacks, and it would be unreasonable for an ALJ to draw inferences that were not supported by the medical evidence.

The undersigned further recommends a finding that the ALJ properly considered the combined effects of Plaintiff's impairments. The ALJ specified that he considered Plaintiff's impairments in combination. *See* Tr. at 422. He also assessed limitations based on Plaintiff's combination of physical impairments, limitations based on Plaintiff's combination of mental impairments, and additional limitations based on individual impairments. *See* Tr. at 428, 429–30. A review of the decision as a whole indicates that the ALJ considered all of Plaintiff's impairments and imposed restrictions based upon their individual and cumulative effects.

### 3.     Inferences From Lack of Medical Treatment

Plaintiff argues that the ALJ failed to consider the directives of SSR 96-7p when he determined that several of her impairments were non-severe because she obtained limited medical attention for the conditions. [ECF No. 13 at 10]. She further contends that the ALJ failed to question her about her ability to obtain medical care and neglected to consider her explanation that she lacked medical insurance and could not afford to obtain treatment. *Id.* at 9–10.

The Commissioner argues that the ALJ permissibly rejected Plaintiff's complaints after weighing them against the objective medical evidence and considering Plaintiff's daily activities. [ECF No. 14 at 21]. The Commissioner maintains that 20 CFR §§ 404.1529(c)(3)(v) and 416.929(c)(3)(v), require the ALJ to consider treatment received,

other than medication, when evaluating a claimant's symptoms. *Id.* at 24. The Commissioner further acknowledges that the ALJ considered many factors in addition to Plaintiff's medical treatment, including her daily activities, her benign diagnostic studies, her unremarkable physical and mental status findings, the opinions of the state agency medical consultants, her history of noncompliance, her continued smoking habit, and her statements to her psychiatrist requesting a schizophrenia diagnosis to support her disability claim. *Id.* at 22–23.

In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's activities of daily living; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), and 416.929(c)(3), SSR 96-7p.

Pursuant to 20 C.F.R. §§ 404.1530 and 416.930, a claimant cannot be found disabled if she does not follow prescribed treatment without good reasons. SSR 96-7p provides that "an individual's statements may be less credible if the level or frequency of

treatment is inconsistent with the level of complaints or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." However, the ALJ must consider the claimant's explanations for a failure to follow prescribed treatment before drawing negative inferences about his or her symptoms and their functional effects. 20 C.F.R. §§ 404.1530 and 416.930, SSR 96-7p. The ALJ is specifically required to consider physical, mental, educational, and linguistic limitations when determining if a claimant has good reasons for failing to follow prescribed treatment. 20 C.F.R. §§ 404.930(c), 416.930(c). The Fourth Circuit also prohibits ALJs from denying a claimant benefits based on a failure to follow prescribed treatment where the claimant lacks the financial resources to obtain treatment. *See Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (holding that the ALJ erred in determining that the plaintiff's impairment was not severe based on her failure to seek treatment where the record reflected that she could not afford treatment); *Gordon v. Schweiker*, 725 F. 2d 231, 237 (4th Cir. 1984) ("it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him"). In *Fleming v. Astrue*, C/A No. 5:11-304-DCN-KDW, 2012 WL 3686622 (D.S.C. Jul. 10, 2012), *adopted by* 2012 WL 3679628 (D.S.C. Aug. 24, 2012), this court found that the ALJ's credibility assessment was flawed and remanded the case where the ALJ considered the plaintiff's failure to seek treatment as a factor in the disability determination and the record reflected that the plaintiff did not have the financial resources to obtain treatment.

The instant case is distinguishable from *Lovejoy*, *Gordon*, and *Fleming*. Here, the ALJ specifically considered Plaintiff's explanation of her alleged financial inability to obtain treatment, but cited evidence to suggest that Plaintiff's testimony was not fully credible regarding alleged financial barriers to treatment. The ALJ acknowledged that Plaintiff testified "she was unable to seek out a lot of medical care due to her limited finances." Tr. at 425. However, he subsequently noted that Plaintiff generally received monthly mental health care, but had lapses in treatment between July 2009 and January 2010 and again between December 2010 and January 2010 without explanation. Tr. at 426. He indicated that Plaintiff had sought limited medical care for her knee, ventral hernia, obesity, and non-severe impairments and had not had surgery, physical therapy, injections or required inpatient hospitalization. *Id.* However, the ALJ noted that medical records indicated Plaintiff "smoked cigarettes daily" despite their "associated financial cost." Tr. at 427. SSR 96-7p and the decisions in *Lovejoy*, *Gordon*, and *Fleming* do not prohibit ALJs from considering a lack of medical treatment as a factor in disability determinations. In fact, SSR 96-7p and 20 C.F.R. §§ 404.1530 and 416.930 require that it be considered, along with the claimant's explanation for the lack of medical treatment. Here, the ALJ considered Plaintiff's explanation and provided reasons for rejecting it. Therefore, the ALJ complied with the applicable law and his conclusion was consistent with 20 C.F.R. §§ 404.1530 and 416.930 and SSR 96-7p. In light of the foregoing, the undersigned recommends a finding that the ALJ committed no error by considering and making inferences based upon Plaintiff's lack of medical treatment.

4.    SSR 00-4p

Plaintiff notes that the 2011 Report indicated that the *DOT* was silent regarding contact with the general public, creating a conflict between the *DOT* and the VE's testimony. [ECF No. 13 at 11]. Plaintiff further maintains that because the ALJ identified one of the same restrictions and failed to challenge the VE regarding the conflict, the ALJ violated Judge Seymour's order and failed to comply with SSR 00-4p. *Id.* at 11–12.

The Commissioner argues that the case was previously remanded, in part, because the ALJ neglected to inquire as to whether the VE's testimony conflicted with the *DOT*. [ECF No. 14 at 23]. The Commissioner maintains that the ALJ fulfilled his duty under SSR 00-4p when he questioned the VE as to whether his testimony was consistent with the *DOT* and the VE answered in the affirmative. *Id.* The Commissioner further argues that the jobs identified by the VE required no interaction with the general public. *Id.* at 24.

Judge Seymour's order directed the Commissioner to inquire of the VE, on the record, whether there were conflicts between the assessed RFC and any jobs the VE found Plaintiff could perform. Tr. at 517.

The provisions of 20 C.F.R. §§ 404.1566(d) and 416.966(d) provide that the ALJ should take administrative notice of job information contained in the *DOT*. In some cases, ALJs call upon the services of VEs to address how certain restrictions affect claimants' abilities to perform specific jobs. 20 C.F.R. §§ 404.1566(e), 416.966(e). Because the opinions of VEs sometimes conflict with the information contained in the *DOT*, the SSA promulgated SSR 00-4p to explain how these conflicts should be resolved.

"Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT." SSR 00-4p. Before relying on VE evidence to support a disability decision, the ALJ must obtain a reasonable explanation for any apparent unresolved conflict between occupational evidence provided by the VE and the information in the *DOT*, and explain in the determination or decision how any conflict that has been identified was resolved. *Id.* This task is generally accomplished when the ALJ inquires, on the record, as to whether or not the VE's testimony is consistent with the *DOT* and the VE either discusses the reasons for inconsistencies or testifies that no conflict exists. *Id.*

At the beginning of the VE's testimony, the ALJ provided the following instruction: "Mr. Wilson, do you understand that if you give us an opinion which conflicts with the information in the DOT, you will need to advise us of a conflict and the basis for your opinion." Tr. at 477. The VE indicated that he would do so. *Id.* Then, the ALJ further indicated "[a]nd that was one of the reasons—one of several grounds for the previous remand, so please be sure if there's any conflict, you bring that out to us." *Id.* After the VE responded to the hypothetical questions posed by the ALJ and Plaintiff's attorney, the ALJ again asked the VE if his testimony was consistent with the *DOT* and the VE responded in the affirmative. Tr. at 482. Then, Plaintiff's attorney asked the VE if any testimony not based on the *DOT* was based on "your own personal experiences and your years of expertise." Tr. at 482. The VE confirmed that it was. Tr. at 483.

The ALJ wrote in the decision "[p]ursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information

contained in the Dictionary of Occupational Titles." Tr. at 431. He further indicated "[b]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. at 432.

The undersigned recommends a finding that the ALJ complied with the requirements of SSR 00-4p. The ALJ initially instructed the VE to inform him of conflicts between his testimony and the *DOT*, next reiterated the importance of the VE informing him of any conflicts, and finally questioned the VE about conflicts at the end of the hearing. *See* Tr. at 477, 482. The VE assured the ALJ that he would identify any conflicts and subsequently informed the ALJ that no conflicts existed. *See id.* The ALJ's actions comply with the specific requirements outlined in SSR 00-4p.

Nevertheless, Plaintiff argues that the ALJ failed to resolve an apparent conflict because of the *DOT*'s silence with regard to non-exertional limitations in the assessed RFC. *See* ECF No. 13 at 11. The undersigned is unpersuaded by this argument for several reasons. First, the ALJ performed his duties under SSR 00-4p and relied upon the testimony of the VE who is, by definition, an expert with respect to occupational definitions and requirements. Second, the non-exertional limitations assessed by the ALJ differed from the more specific ones assessed by the first ALJ, which presented evident inconsistencies with the *DOT*. *See* Tr. at 13, 424. Third, the undersigned's review of the *DOT* descriptions of the jobs identified by the VE does not suggest an obvious conflict between their descriptions and the assessed restrictions. Fourth, even if there were some

conflict between the *DOT* and the VE's testimony, Plaintiff's counsel obtained assurance from the VE during the hearing that any of the VE's testimony not derived directly from the *DOT* was based upon the VE's years of experience. *See* Tr. at 482–83. This rendered moot any issue with respect to the *DOT*'s silence on the non-exertional limitations of the identified jobs. Therefore, the undersigned recommends a finding that the ALJ did not fail to resolve any apparent conflict.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

December 12, 2014                          Shiva V. Hodges
Columbia, South Carolina                   United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).